UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| RITA McCALL, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:06-cv-752-RLY-WTL |
| | ) | |
| EMERSON APPLIANCE CONTROLS and | ) | |
| MALLORY CONTROLS, | ) | |
|     Defendants. | ) | |

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**I.    Background**

Plaintiff Rita McCall ("Plaintiff"), filed the present suit against her former employer, Defendant Emerson Appliance Controls ("Emerson"), and Mallory Controls ("Mallory") (collectively "Defendants") arising out of her termination.  Plaintiff alleges that her termination was in retaliation for filing a worker's compensation claim and that Emerson's actions constituted both negligent and intentional infliction of emotional distress.  Plaintiff originally filed her suit in Clinton Superior Court, but Defendants subsequently removed the case to this court based on diversity of citizenship.  Plaintiff moved to remand the case, but the court denied that motion finding that it had diversity jurisdiction at the time of removal.  *See* July 5, 2007, Order.  Defendants now move for summary judgment pursuant to Federal Rule of Civil Procedure 56 on Plaintiff's claims.  For the reasons set forth below, the court **GRANTS** Defendants' motion in its entirety.

1

## II. Mallory as a Defendant

Before addressing the facts and merits of Plaintiff's claims, the court finds it necessary to address the issue of whether Mallory is an appropriate Defendant. In their Brief in Support of Motion for Summary Judgment ("Supporting Brief"), Defendants argue that Mallory is not a proper defendant in this case because Plaintiff was never employed by Mallory. Plaintiff apparently concedes this point in her Memorandum in Opposition ("Response") to Defendants' summary judgment motion. *See* Plaintiff's Response at 1 ("As to the Defendant Mallory Controls, if opposing counsel had written to Plaintiff's counsel, it could have been dismissed from the case without Defendants wasting a few pages of their brief on this issue. Therefore this is not an issue."). As such, Defendants' motion for summary judgment with respect to Mallory is **GRANTED**. The court will hereinafter refer to Emerson as "Defendant," and as to Emerson and Mallory's exhibits, the court will cite them as "Defendant's" exhibits.

## III. Summary Judgment Standard

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that

party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In deciding whether a genuine issue of material fact exists, the court views the evidence and draws all inferences in favor of the nonmoving party. *Miranda v. Wis. Power & Light Co.*, 91 F.3d 1011, 1014 (7th Cir. 1996).

**IV.  Statement of Facts**[1]

    **A.  Background**

1. Defendant manufactures electromechanical and electronic timing devices, synchronous timing motors, and automotive components. (Affidavit of Ed Uhlig ("Uhlig Aff.") at ¶ 5, Defendant's Ex. 2).

2. Plaintiff began working for Defendant through a temporary agency around July 13, 2004, and, after working 90 days, was hired as a full-time employee of Defendant in mid-October 2004. (Deposition of Rita McCall ("Plaintiff Dep.") at 36–38, 41, Defendant's Ex. 1; Orientation Checklist, Plaintiff Dep. Ex. 4; Application for Employment, Plaintiff Dep. Ex. 5).

3. Plaintiff worked second shift (3:00 p.m. to 11:00 p.m.) as a production associate for Defendant, which included performing assembly, product handling, and packing tasks. (March 9, 2005, Letter, Plaintiff Dep. Ex. 3 at Disc-0007; Plaintiff Dep. at 122).

---

[1] The court, which granted Defendants' motion for leave to file a supplement to their Reply, has taken into consideration Defendants' evidentiary objections to Plaintiff's affidavit in setting forth the relevant facts and citations to the record in this Entry.

**B.      Defendant's Attendance Policy**

4.  Defendant maintained an attendance policy, which Plaintiff signed when she began working for Defendant in July 2004, that assessed points against employees for unexcused absences from work. (Attendance Policy Guidelines, Plaintiff Dep. Ex. 7).

5.  Under the attendance policy, excused absences included the following: bereavement leave, designated inclement weather days, approved worker's compensation absences, layoff, military duty, jury duty, FMLA-qualifying events, vacation, plant shut down, and witness duty. (*Id.*). Except for approved worker's compensation and FMLA absences, absences due to illness were considered unexcused. (*See id.*).

6.  To qualify for excused worker's compensation leave, a Defendant-approved physician must order that the employee refrain from work entirely. (Uhlig Aff. at ¶ 10).

7.  Points for unexcused absences under Defendant's attendance policy were assessed as follows: being absent from work up to 1 hour = 0.5 point; being absent more than 1 hour but less than 2 hours = 1 point; being absent from work more than 2 hours but less than 4 hours = 2 points; being absent from work more than 4 hours up to a full day = 4 points. (Attendance Policy Guidelines).

8.  Defendant calculated employees' point status based on a rolling 12-month period. (*Id.*). The following disciplinary proceedings occurred if an employee reached the

       corresponding point status within the previous 12 months:  12 points = verbal warning; 18 points = written warning; 21 points = final warning; 24+ points = termination.  (*Id.*).

9. Between January 7, 1998, and March 21, 2006, Defendant terminated 177 individuals, including those who had never filed a worker's compensation claim or who had accrued attendance points for absences unrelated to workplace injuries, for violating its attendance policy.  (Uhlig Aff. at ¶ 13).

    **C.**    **Plaintiff's Injury and Worker's Compensation Claim**

10. On Wednesday, November 3, 2004, Plaintiff injured her right hand at work when she hit the lower part of her palm on the bottom of a button.  (Plaintiff Dep. at 79–81).  Plaintiff injured her hand sometime between 7:00 p.m. and 9:00 p.m., but continued to work the rest of her shift, testifying that she did not realize the extent of her injury.  (*Id.* at 81–82, 89).

11. The next day, November 4, 2004, Plaintiff's hand continued to hurt and was swollen.  (*Id.* at 83).  However, Plaintiff reported to work that afternoon and told her supervisor, Cindy Payne ("Payne"), about the injury. (*Id.*).  In an attempt to ease the pressure in her hand, Payne gave Plaintiff a wristband, which ultimately made Plaintiff's pain worse.  (*Id.*).  The evidence is unclear, but Plaintiff apparently completed her shift on November 4, 2004.  (*See id.* at 84–85).

12. The next morning, Friday, November 5, 2004, Plaintiff called Payne's supervisor, Lynne Vanscoter ("Vanscoter"), to tell Vanscoter about her injury.  (*Id.* at 85;

        Affidavit of Rita McCall ("Plaintiff Aff.") at ¶ 6, Plaintiff's Ex. 1).

13. Pursuant to Vanscoter's instructions, Plaintiff arrived at work that day at 2:00 p.m. in order to complete an accident report with Payne. (Plaintiff Dep. at 85–86). Plaintiff met Payne as soon as Plaintiff arrived at work at 2:00 p.m. and recounted to Payne her conversation with Vanscoter. (*Id.* at 91). Payne told Plaintiff to wait, and Payne would get the paperwork for them to complete. (*Id.*).

14. Five hours later, at 7:00 p.m., Payne returned to Plaintiff with the appropriate paperwork, and they completed Plaintiff's accident report. (*Id.*; Supervisors Report and Accident Investigation ("Supervisor Report"), Plaintiff Dep. Ex. 9).

15. Plaintiff asked whether she would be able to see the doctor that night, but Payne said at that time of night, everyone in the office had left. (Plaintiff Dep. at 91–92). Although Plaintiff protested saying that she arrived at work early in order to complete her paperwork and see a doctor, Payne responded that she could do nothing about the situation. (*Id.* at 92).

16. After completing the paperwork, Plaintiff returned to work for a time. (*Id.*). However, the pain in her hand persisted. (*Id.*). Plaintiff asked Payne if there was anyway she could see a doctor, but Payne said that if Plaintiff went to the hospital, Plaintiff would have to pay for it. (*Id.* at 92–93). Because Plaintiff said that she did not have the money to go to the hospital, Plaintiff apparently returned to work. (*Id.* at 93). Plaintiff then decided that she could not continue working due to the pain in her hand. (*Id.* at 93–94). After asking Payne if she could go to the hospital

       (to which Payne responded "no"), Plaintiff left work four hours early to go home and soak her hand to ease the pain. (*Id.* at 94). Plaintiff received four points for missing four hours of her shift. (*Id.* at 100–01).

17. On Monday, November 8, 2004, Plaintiff returned to work at 2:00 p.m., an hour before her shift started, and talked with Ed Uhlig ("Uhlig") in human resources about having to leave early the previous Friday. (*Id.* at 100). Uhlig told Plaintiff that Defendant would not erase the four points Plaintiff received for leaving her shift early because Plaintiff could have gone to the hospital and Defendant would have paid for it. (*Id.* at 100–01).

18. Uhlig scheduled Plaintiff an appointment with Dr. John Crane ("Dr. Crane"), a company doctor, the following afternoon on November 9, 2004. (*Id.* at 102; Plaintiff Aff. at ¶ 11). After examining her hand, Dr. Crane concluded that Plaintiff had probably hit a nerve, and he put her on light duty for one week, prohibiting any use of her right hand. (Plaintiff Dep. at 102).

19. Defendant has a number of "light duty" positions that can be performed one-handed for employees that have been placed on a light duty restriction by Defendant's worker's compensation physician. (Uhlig Aff. at ¶¶ 7–9).

20. Plaintiff was assigned to one of these light duty positions. (*See* Plaintiff Dep. at 107). Although she was only supposed to use her left hand to complete her tasks, Plaintiff testified that she would use her right hand because Payne yelled at her for working too slowly. (*Id.* at 107, 109).

21. In addition to criticizing her for her slow work place, Plaintiff testified that Payne "harassed" her in other ways, including: telling her to stop clocking in early; following Plaintiff to the restroom and outside on her breaks; warning Plaintiff for talking to other employees; and assigning Plaintiff to more difficult positions after she complained about Payne. (Plaintiff Aff. at ¶ 28). However, Payne also reprimanded other employees for violating Defendant's policies by talking during work time, clocking in early, and failing to use the restroom during break time. (Affidavit of Cindy Payne ("Payne Aff.") at ¶ 8, Defendant's Ex. 3).

22. In December, Plaintiff asked Uhlig to make her another appointment with Dr. Crane, as her hand was still hurting, but Uhlig suggested instead that Plaintiff look on the internet for hand exercises. (Plaintiff Dep. at 166).

23. In February 2005, Plaintiff complained to Uhlig that her hand was still hurting, and Uhlig arranged for Plaintiff to see Dr. Crane on February 15, 2005. (*Id.* at 168; Plaintiff Aff. at ¶ 29). Dr. Crane scheduled an electromyogram ("EMG") for Plaintiff's hand to determine if she had sustained nerve damage. (Plaintiff Dep. at 168–69).

24. In July 2005, Plaintiff had surgery on her hand to relieve the pain. (Plaintiff Aff. at ¶ 35).

25. Defendant has paid all of Plaintiff's medical bills and settled her worker's compensation claim. (Plaintiff Dep. at 195).

### D. Plaintiff's Absences and Termination

26. Before Plaintiff's injury, she had accrued seven attendance points. (Verbal Warning at 2, Plaintiff Dep. Ex. 11).

27. As discussed above, Plaintiff received four attendance points for leaving early on November 5, 2004. (*Id.*).

28. On November 24, 2004, Plaintiff was assessed two attendance points for leaving early. (*Id.*). The attendance report notes that Plaintiff left for personal business, but Plaintiff testified that she left early because her hand hurt. (*Id.*; Plaintiff Dep. at 156).

29. On December 3, 2004, Plaintiff left work early because her hand hurt, and she was assessed two attendance points for this absence. (Verbal Warning at 2; Plaintiff Dep. at 157).

30. After Plaintiff's December 3, 2004, absence, Plaintiff had accrued fifteen attendance points and was given a verbal warning. (Verbal Warning at 1). Plaintiff refused to sign this warning because she disputed that she should have received four points for leaving work early on November 5, 2004, after her injury occurred. (*Id.*).

31. On January 20, 2005, Plaintiff missed a day of work due to illness and received four attendance points. (Written Warning at 2, Plaintiff Dep. Ex. 12). Plaintiff does not remember if this absence was due to her hand hurting. (Plaintiff Dep. at 158–59).

9

32. On February 11, 2005, Plaintiff received two more attendance points for leaving work early due to personal business. (Final Warning at 2, Plaintiff Dep. Ex. 13).

33. On February 21, 2005, Plaintiff received both a written and final warning due to her absences on January 20, 2005 (which brought her attendance points to 19), and February 11, 2005 (which brought her attendance points to 21). (Written Warning; Final Warning). Plaintiff refused to sign either warning due to "unjust cause," as Plaintiff disagreed that she should have received attendance points for absences due to her hand injury. (Plaintiff Dep. at 163).

34. On the morning of March 4, 2005, Plaintiff saw her personal physician, Dr. David Parks ("Dr. Parks"), concerning her hand. (*Id.* at 171). During her appointment, Dr. Parks said that he would not examine Plaintiff's hand or try to diagnose her problem because it was a worker's compensation injury. (*Id.* at 173). Rather, Dr. Parks told Plaintiff that she needed to call Defendant to schedule another appointment with Dr. Crane about her injury. (*Id.* at 173–74). Dr. Parks recommended that Plaintiff stay off work for about ten days until Dr. Crane could see Plaintiff or until the swelling went down, and he completed a doctor's note to that effect. (*Id.* at 175; March 4, 2005, Doctor's Note, Plaintiff Dep. Ex. 3 at Disc-0022).

35. Plaintiff called Ed Uhlig's office after her appointment to relay Dr. Park's suggestion that Plaintiff remain off work. (Plaintiff Dep. at 175). Plaintiff spoke to Uhlig's secretary, as Uhlig was out, and although Uhlig's secretary contacted

        other individuals to address Plaintiff's issue, the record indicates that Plaintiff did not receive authorization to miss work that day.  (*Id.* at 176).

36. Plaintiff did not report for work on Friday, March 4, and she received four attendance points for that absence.  (*Id.* at 177; *see also* Uhlig Aff. at ¶ 19).

37. Plaintiff also missed work on Monday, March 7 and Tuesday, March 8, 2005.  (Plaintiff Dep. at 177–78).

38. On Monday, March 7, Plaintiff called Jack Kibler ("Kibler") in human resources requesting a personal leave of absence for that day.  (Affidavit of Jack Kibler at ¶ 4, Defendant's Ex. 4).  He responded that he would talk to Uhlig about the request, but Kibler never gave Plaintiff permission to be absent that day.  (*Id.*).  Plaintiff received four attendance points for missing work that day.  (*See* Uhlig Aff. at ¶ 19).

39. On Tuesday, March 8, Plaintiff spoke with Uhlig about being absent that day due to her hand injury and the doctor's note Dr. Parks had written stating that Plaintiff should remain off work for ten days.  (*Id.* at ¶ 16).  Uhlig responded that her absence would not likely be excused because the worker's compensation doctor, Dr. Crane, had put her on light duty work.  (*Id.*).

40. Uhlig met with Plaintiff on March 9, 2005, and explained to her that he could not approve the ten-day medical leave Dr. Parks had approved because Plaintiff's injury was work-related and Dr. Parks was not the worker's compensation doctor.  (*Id.* at ¶ 18).  Rather, Dr. Crane, Defendant's worker's compensation doctor, had

11

       put Plaintiff on light duty and had not restricted her from working completely. (*Id.*).

41.    Because Plaintiff's attendance points through March 7, 2005, totaled 29, five more than the 24 points required to terminate an employee under the attendance policy, Uhlig terminated Plaintiff's employment. (*Id.* at ¶ 19).

## V.    Discussion

### A.    Retaliatory Discharge

Under Indiana law, employment is presumed terminable at-will, meaning that an employee may be terminated without just cause. *Wior v. Anchor Indus., Inc.*, 669 N.E.2d 172, 175 (Ind. 1996). However, in *Frampton v. Central Indiana Gas Co.*, 297 N.E.2d 425 (Ind. 1973), the Indiana Supreme Court held that an employee may not be terminated for filing a worker's compensation claim finding, "when an employee is discharged solely for exercising a statutorily conferred right an exception to the general rule [of at-will employment] must be recognized. *Id.* at 428. The term "solely" used by the *Frampton* court has been held to mean that, in order to sustain a claim for retaliatory discharge, any and all reasons for an employee's discharge must be unlawful. *Dale v. J.G. Bowers, Inc.*, 709 N.E.2d 366, 369 (Ind. Ct. App. 1999).

In this case, Defendant terminated Plaintiff because she had accumulated more than 24 attendance points in a 12-month period, which was grounds for termination under Defendant's attendance policy. Plaintiff argues that she should not have received some of those attendance points, not because she was actually present at work when Defendant

assessed her those points, but because some of those absences were related to her work injury and should have been excused. However, the court may not take on the role of a "super-personnel department" reexamining an entity's business decisions. *Purdy v. Wright Tree Serv., Inc.*, 835 N.E.2d 209, 214 (Ind. Ct. App. 2005). The evidence indicates that Defendant was unwilling to relax its attendance policy for Plaintiff because she had suffered a work-related injury. However, Defendant is entitled to enforce its policies as strictly as it deems fit, so long as that enforcement is not contrary to law.

      Here, once Plaintiff realized the severity of her injury and notified her supervisor and human resources, she was provided with the requisite worker's compensation paperwork to complete. Within a couple business days of completing her paperwork, she was able to see Defendant's worker's compensation doctor, Dr. Crane, who recommended that Plaintiff refrain from using her injured hand and be placed on light duty performing tasks only requiring the use of one hand. Dr. Crane did not recommend that Plaintiff abstain from work entirely. Although Plaintiff may have disagreed with Dr. Crane's recommendation and felt that she could not work with her pain some days, Plaintiff was at the mercy of Defendant's doctor whose opinions Defendant was entitled to follow. *See Bowles v. Gen. Elec.*, 824 N.E.2d 769, 775 (Ind. Ct. App. 2005) (stating that under the Indiana Worker's Compensation Act, employees put themselves under the direction and control of their employer's doctors).

      On the days that Plaintiff incurred attendance points for leaving early or missing work due to her hand, the evidence does not indicate that she sought medical attention or

13

requested to see Dr. Crane.  Further, when Plaintiff saw Dr. Crane again in February 2005, he again did not recommend that Plaintiff refrain from working entirely,[2] suggesting that even if Plaintiff had seen Dr. Crane sooner, he would have maintained his light-duty recommendation.  Although Defendant's treatment of Plaintiff may have been unsympathetic, it was not unlawful.  Defendant adhered to the recommendation of its physician that Plaintiff could work, albeit one-handed, and continued to enforce its attendance policy in assessing Plaintiff points for her unexcused absences.  By March 9, 2005, Plaintiff had accumulated 29 attendance points due to her unexcused absences and was terminated pursuant to Defendant's attendance policy.  Because Defendant had a lawful reason for terminating her, Plaintiff cannot establish that she was terminated *solely* due to her filing a worker's compensation claim.  *See Smith v. Elec. Sys. Div. of Bristol Corp.*, 557 N.E.2d 711, 712–13 (Ind. Ct. App. 1990) (upholding grant of summary judgment for employer in *Frampton* action where employee was discharged for violating employer's attendance policy when employee's excessive absences were due to her work-related injury).  Thus, her retaliatory discharge claim under *Frampton* must fail.  Defendant's motion for summary judgment on Plaintiff's *Frampton* claim is **GRANTED**.

---

[2] Dr. Crane's recommendations to Plaintiff after her February 15, 2005, appointment are unclear.  The court presumes that he did not recommend Plaintiff abstain from working entirely, as she continued to work and was assessed attendance points for unexcused absences after that appointment.  Although Defendant indicates that Plaintiff was no longer on a light-duty restriction, that conflicts with Dr. Crane's order of additional tests to diagnose Plaintiff's injury and Plaintiff's subsequent need for surgery on her injured hand.

### B.     Intentional Infliction of Emotional Distress

In addition to her retaliatory discharge claim, Plaintiff alleges that Defendant's actions, including Payne's harassment and Plaintiff's ultimate termination, constituted intentional infliction of emotional distress. "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress." *Powdertech, Inc. v. Joganic*, 776 N.E.2d 1251, 1264 (Ind. Ct. App. 2002) (quoting *Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind. 1991)). Conduct is extreme and outrageous "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (quoting *Conwell v. Beatty*, 667 N.E.2d 768, 777 (Ind. Ct. App. 1996)). Liability for intentional infliction of emotional distress "does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." RESTATEMENT (SECOND) OF TORTS § 46 cmt. d.

In support of her claim, Plaintiff sets forth examples of Payne's harassing behavior, which Plaintiff alleges constitute intentional infliction of emotional distress. While the evidence indicates that perhaps Payne was a strict supervisor insensitive to Plaintiff's injury, Payne's actions are not extreme and outrageous. Many of Payne's actions were in an effort to enforce Defendant's policies, including those against talking during work time and clocking in early. Enforcing a company policy on talking, using the restroom, and clocking in early in the manner Plaintiff alleges is not grounds for

liability for intentional infliction of emotional distress. Payne's behavior is more appropriately classified as a "petty oppression" or a "triviality," not so extreme or outrageous to go beyond all bounds of decency. Plaintiff also claims that Defendant's termination of her employment constitutes intentional infliction of emotional distress, but as discussed above, Defendant terminated Plaintiff for violating its attendance policy. That action also fails to meet the extreme or outrageous standard. As such, Defendant's motion for summary judgment on Plaintiff's claim for intentional infliction of emotional distress is **GRANTED**.

### C. Negligent Infliction of Emotional Distress

Plaintiff last claims that Defendant's actions constitute negligent infliction of emotional distress. Under Indiana law:

> [W]hen . . . a plaintiff sustains a direct impact by the negligence of another and, by virtue of that direct involvement sustains an emotional trauma which is serious in nature and of a kind and extent normally expected to occur in a reasonable person . . . such a plaintiff is entitled to maintain an action to recover for that emotional trauma without regard to whether the emotional trauma arises out of or accompanies any physical injury to the plaintiff.

*Alexander v. Scheid*, 726 N.E.2d 272, 283 (Ind. 2000) (quoting *Shuamber v. Henderson*, 579 N.E.2d 452, 456 (Ind. 1991)). Under this rule, the direct impact must be physical. *Powdertech*, 776 N.E.2d at 1263. While Plaintiff in this case alleges that she suffered a direct impact from Payne's harassing behavior, Plaintiff alleges no direct *physical* impact. Plaintiff's injury itself cannot satisfy the physical requirement of this rule, as Plaintiff's own actions caused her injury. As such, Defendant's motion for summary judgment on

Plaintiff's claim for negligent infliction of emotional distress is **GRANTED**.

### VI.  Conclusion

For the foregoing reasons, the court **GRANTS** Defendants' motion for summary judgment (Docket # 25) in its entirety.

**SO ORDERED** this 8th day of January 2008.

_____
RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana


Electronic copies to:

Laura Lee Bowker
LAW OFFICE OF LAURA L. BOWKER
laurabowker@hotmail.com

Mark W. Ford
ICE MILLER LLP
mark.ford@icemiller.com

Paul C. Sweeney
ICE MILLER LLP
paul.sweeney@icemiller.com